## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CHAILE STEINBERG, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 16-11668 |
| v. | ) ) | JURY TRIAL DEMANDED |
| AEGERION PHARMACEUTICALS, INC., DAVID SCHEER, SOL J. BARER, ANTONIO M. GOTTO JR., SANDFORD D. SMITH, PAUL G. THOMAS, ANNE M. VANLENT, JORGE PLUTZKY, DONALD K. STERN, QLT INC., and ISOTOPE ACQUISITION CORP., | ) ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. | ) ) | |

## COMPLAINT FOR VIOLATION OF SECTIONS 14(A) AND 20(A)
## OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by her undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This action stems from a proposed transaction announced on June 15, 2016 (the "Proposed Transaction"), pursuant to which Aegerion Pharmaceuticals, Inc. ("Aegerion" or the "Company") will be acquired by QLT Inc. ("Parent") through its wholly-owned subsidiary, Isotope Acquisition Corp. ("Merger Sub," and together with Parent, "QLT").

2. On June 14, 2016, Aegerion's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, each outstanding share of Aegerion common stock will be exchanged for 1.0256 shares of Parent common stock.

3.      On August 8, 2016, defendants issued materially incomplete and misleading disclosures in the Form S-4 Registration Statement (the "Registration Statement") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.  The Registration Statement is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.

4.      Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Aegerion common stock.

9.      Defendant Aegerion is a Delaware corporation and maintains its principal executive offices at One Main Street, Suite 800, Cambridge, MA 02142.  The Company is a

biopharmaceutical company dedicated to the development and commercialization of innovative therapies for patients with debilitating rare diseases. Aegerion's common stock is traded on the NasdaqGS under the ticker symbol "AEGR."

10.     Defendant David Scheer ("Scheer") is a director of Aegerion. According to the Company's website, Scheer is Chair of the Nominating and Governance Committee, a member of the Compensation Committee, and a member of the Compliance Committee.

11.     Defendant Sol J. Barer ("Barer") is a director of Aegerion. According to the Company's website, Barer is a member of the Audit Committee and the Compensation Committee.

12.     Defendant Antonio M. Gotto Jr. ("Gotto") has served as a director of Aegerion since January 2005. According to the Company's website, Gotto is a member of the Nominating and Governance Committee and the Compliance Committee.

13.     Defendant Sandford D. Smith ("Smith") has served as a director of Aegerion since January 2012. According to the Company's website, Smith is Chair of the Board and a member of the Nominating and Governance Committee.

14.     Defendant Mary T. Szela ("Szela") has served as the Company's Chief Executive Officer ("CEO") since January 2016.

15.     Defendant Paul G. Thomas ("Thomas") is a director of Aegerion. According to the Company's website, Thomas is Chair of the Compensation Committee and a member of the Audit Committee.

16.     Defendant Anne M. VanLent ("VanLent") has served as a director of Aegerion since April 2013. According to the Company's website, VanLent is Chair of the Audit Committee and a member of the Compensation Committee.

17.     Defendant Jorge Plutzky ("Plutzky") has served as a director of Aegerion since April 2015.  According to the Company's website, Plutzky is a member of the Nominating and Governance Committee.

18.     Defendant Donald K. Stern ("Stern") is a director of Aegerion.  According to the Company's website, Stern is a member of the Audit Committee and Chair of the Compliance Committee.

19.     The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

20.     Defendant Parent is incorporated under the laws of British Columbia.

21.     Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action on behalf of herself and the other public stockholders of Aegerion (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

23.     This action is properly maintainable as a class action.

24.     The Class is so numerous that joinder of all members is impracticable.  As of June 7, 2016, there were approximately 29,504,912 shares of Aegerion common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

25.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

26.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

27.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

28.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

29.     Aegerion is a biopharmaceutical company dedicated to the development and commercialization of innovative therapies for patients with debilitating rare diseases.

30.     The Company's products include JUXTAPID® and MYALEPT®.

31.     JUXTAPID is a microsomal triglyceride transfer protein ("MTP") inhibitor indicated as an adjunct to a low-fat diet and other lipid-lowering treatments, including LDL apheresis where available, to reduce low-density lipoprotein cholesterol ("LDL-C"), total cholesterol ("TC"), apolipoprotein B ("apo B"), and non-high-density lipoprotein cholesterol ("non-HDL-C") in patients with homozygous familial hypercholesterolemia ("HoFH").

32.     MYALEPT is a leptin analog indicated as an adjunct to diet as replacement therapy to treat the complications of leptin deficiency in patients with congenital or acquired generalized lipodystrophy.

33.     On May 16, 2016, the Company issued a press release wherein it announced its first quarter 2016 financial results.

34.     According to the May 16 press release, Aegerion recorded: (i) total net product sales of $35.7 million; (ii) $26.2 million in net product sales of JUXTAPID capsules, $23.6 million, or 90%, of which was from prescriptions written in the United States; and (iii) $9.5 million in net product sales of MYALEPT for injection in the first quarter of 2016.

35.     The Company reported that it expected to initiate a study to evaluate lomitapide in pediatric HoFH patients in the second quarter of 2016 and to submit a marketing authorization application ("MAA") for metreleptin to treat generalized lipodystrophy in the EU by the end of 2016.

36.     With respect to the financial results, Individual Defendant Szela, the Company's CEO, commented:

> In the first quarter, Aegerion made important progress executing on its turnaround strategy and addressing the immediate issues facing the Company. . . . We are encouraged that we have a solid base of adult HoFH patients on JUXTAPID who are committed to managing their disease.  We plan to exit 2016 with a run rate that allows us to return to cash generation in 2017 and as a more agile organization, appropriately sized to achieve long-term growth.

37.     On August 9, 2016, the Company issued a press release wherein it announced its second quarter 2016 financial results.

38.     According to the August 9 press release, Aegerion recorded: (i) total net product sales of $44.5 million; (ii) $31.1 million in net product sales of JUXTAPID capsules, $20.4 million, or 66% of which was from prescriptions written in the United States; and (iii) $13.5

million in net product sales of MYALEPT for injection in the second quarter of 2016, $9.9

million, or 73% of which was from prescriptions written in the U.S.

39.     The Company reported that it intends to submit an MAA for metreleptin to treat

generalized lipodystrophy and severe partial lipodystrophy in the EU by the end of 2016, and it

anticipates marketing approval for lomitapide in Japan by year-end 2016.

40.     With respect to the financial results, Individual Defendant Szela commented:

> We remain fully committed to maximizing JUXTAPID and MYALEPT, and
> expect both products to continue serving as important pillars of our business.
> While we continue to see erosion of JUXTAPID patients at a meaningful rate, due
> to the availability of PCSK9 inhibitors, we remain confident that we have a base
> of HoFH patients for whom PCSK9 inhibitors will prove insufficient and for
> whom JUXTAPID will remain an important treatment. We also have early
> encouraging signs of adult HoFH patients coming back onto JUXTAPID therapy
> after being treated with a PCSK9 inhibitor, although the numbers remain small at
> this time.
>
> MYALEPT remains an important growth driver for Aegerion. We have received
> positive feedback from physicians and GL patients about the importance of this
> therapy, and are working diligently to achieve our goals of expanding into global
> markets and additional indications. We were pleased to have recorded our first ex-
> U.S. sales of MYALEPT in the second quarter, and look forward to continuing
> our momentum to deliver this therapy to patients in need globally[.]

***Background of the Proposed Transaction***

41.     The Proposed Transaction is the result of a flawed process tilted in favor of QLT

and led by conflicted Individual Defendant Szela, who knew as early as February 6, 2016 that

she would serve as the CEO of QLT following a merger.  Indeed, a significant portion of the

"process" was focused on the corporate governance structure of the post-transaction company.

42.     In January 2016, Individual Defendants Szela and Smith met with Dr. Geoffrey

Cox ("Cox"), QLT's Interim CEO, and the CEO of "Company A" to discuss potential business

development opportunities.

43.     Shortly thereafter, on January 13, 2016, Aegerion and QLT entered into a confidentiality agreement.

44.     On February 6, 2016, Gregory Perry ("Perry"), Aegerion's Chief Financial and Administrative Officer, and Thurein Htoo ("Htoo"), Aegerion's Senior Director of Business Development, held a telephonic meeting with representatives of QLT regarding a potential strategic transaction between Aegerion and QLT, and discussed "potential governance arrangements" in connection with the possible transaction.  The Registration Statement fails to disclose the nature of these discussions regarding the potential governance arrangements.

45.     On February 10, 2016, QLT's representatives delivered a draft term sheet for a potential strategic transaction to Aegerion.  While the Registration Statement fails to disclose the per-share value of QLT's proposal, it does disclose that the draft term sheet stated that Individual Defendant Szela would be CEO of QLT following the merger.

46.     On February 24, 2016, the Board determined to establish a committee of purportedly independent directors in connection with the potential transaction with QLT, consisting of Individual Defendants Barer, Plutzky, Scheer, and Smith (the "Transaction Committee").

47.     Despite the creation of the Transaction Committee, on March 3, 2016, members of Aegerion management (presumably including conflicted Szela) held a meeting with members of QLT management.  Members of Aegerion management again met with QLT management regarding the potential transaction on March 7.

48.     On March 9, 2016, QLT's representatives delivered a revised draft term sheet for the potential transaction to Aegerion, "which reflected further discussions between the parties." The Registration Statement fails to disclose the updates to the draft term sheet, including whether

the updates pertained to the post-transaction employment of Szela and other members of Aegerion management.

49.     On March 11, 2016, the Transaction Committee met telephonically regarding the proposed transaction, with conflicted Szela present, who "provided an update on the proposed possible transaction with QLT," including "certain terms under negotiation."   Again, the Registration Statement fails to disclose these "certain terms under negotiation," including whether they pertained to the post-transaction employment of Szela and other members of Aegerion management.

50.     Despite the formation of the Transaction Committee, members of Aegerion management (presumably including conflicted Szela) subsequently met with QLT management *no less than twenty times* regarding the potential transaction.   It does not appear that the Transaction Committee played any role in connection with (or was even present for) any of the meetings.   To the extent the Transaction Committee itself met, it appears that Szela was present for, and participated in, all such meetings.

51.     On March 25, 2016, the CEO of "Company B" contacted Individual Defendant Szela to discuss a potential strategic transaction with Aegerion.

52.     On April 11, 2016, members of Aegerion management and QLT management met to discuss the organizational structure of QLT, including benefits and compensation plans.

53.     On April 12, 2016, QLT's representatives sent a draft merger agreement to Aegerion, which provided that "each outstanding share of Aegerion common stock would be exchanged for a number of QLT common shares based on a *yet to be determined exchange ratio*." (Emphasis added).  Thus, while Aegerion management had already been negotiating their benefits and compensation plans for their future positions with QLT, the draft merger agreement

apparently did not even contain proposed merger consideration terms.

54.     Between April 15 and April 29, 2016, Aegerion management and representatives of Company A and its financial advisor held several calls to discuss a potential transaction and to conduct due diligence.

55.     Despite Company A conducting due diligence, the Registration Statement fails to disclose whether Company A entered into a confidentiality agreement with Aegerion, and if so, the terms of such agreement, including whether it contained standstill and/or "don't ask, don't waive" provisions.

56.     On May 2, 2016, Aegerion's representatives delivered to QLT's representatives a revised draft merger agreement, which provided for unspecified "all-stock consideration."

57.     On May 17, 2016, the CEO of Company B contacted Szela to discuss a potential strategic transaction with Aegerion.

58.     On May 23, 2016, Szela exchanged emails with the CEO of Company B, requesting that Company B provide a written proposal detailing "governance and other key terms of its proposed transaction."

59.     Company B submitted a proposal later that day, but the Registration Statement fails to disclose the terms of the proposal.

60.      Also on May 23, 2016, Aegerion and Company B entered into a confidentiality agreement.

61.     On May 25, 2016, Company B delivered a proposal to acquire Aegerion for "a premium of 50% to 100% above Aegerion's then current stock price, subject to Company B's ongoing due diligence, with the consideration to be in the form of Company B stock, but indicating that Company B may be willing to consider including a cash component."

62.     On May 31 and June 1, 2016, QLT's and Aegerion's representatives – apparently for the first time – discussed an exchange ratio for the Proposed Transaction.  QLT indicated that it "would be willing to consider a 1.2x exchange ratio."

63.     At an undisclosed time, the Company's "longtime" financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan"), contacted four companies, "three of which stated that they had no interest in a potential transaction with Aegerion, and one of which had not responded to J.P. Morgan's attempts to engage."   Nevertheless, it does not appear that the Board or its advisors contacted any other parties regarding a potential transaction with Aegerion.

64.     The CEO of "Company C" subsequently called Individual Defendant Barer regarding a potential transaction.  According to the Registration Statement, the Board determined that, "if Company C was interested in exploring a potential transaction with Aegerion, Dr. Barer should ask the Chief Executive Officer of Company C to contact Ms. Szela, and also authorized Ms. Szela to engage with the Chief Executive Officer of Company C to learn more."

65.     On June 2, 2016, Individual Defendant Szela called the CEO of Company B to inform him that "*an all-stock transaction was unattractive*," despite the fact that the Proposed Transaction with QLT is an all-stock transaction.  (Emphasis added).  Not surprisingly, Company B subsequently informed Aegerion that it would not be submitting a revised proposal.

66.     On June 3, 2016, Szela contacted the CEO of Company C, who stated that Company C was interested in licensing MYALEPT in Europe and controlling its development in that market.  As with Company B, and despite Company C's interest, Szela rebuffed Company C, and discussions between the parties apparently ended.

67.     The same day, J.P. Morgan received a call from "Company D" to discuss a potential opportunity with Aegerion.

68.     On June 4, 2016, J.P. Morgan and Company D discussed "Company D's proposal."   While the Registration Statement fails to disclose the terms of Company D's proposal, it states that Company D communicated that it was interested in potentially acquiring Aegerion, or as an alternative, acquiring MYALEPT.

69.     On June 5, 2016, "based on feedback from Aegerion management" (presumably including Szela), J.P. Morgan responded to Company D, which, for reasons unclear from the Registration Statement, then stated that it would not pursue a transaction with Aegerion, despite its expression of interest the very day before.

70.     On June 12, 2016, the Board met and, apparently for the first time, discussed a transaction with QLT that would include a 1.0256x equity exchange ratio.

71.     Two days later, the Board approved the Proposed Transaction, and the parties executed the Merger Agreement that day.

**_The Merger Agreement_**

72.     Despite the Company's prospects for future growth, the Board caused the Company to enter into the Merger Agreement, pursuant to which Aegerion will be acquired by QLT for inadequate consideration.

73.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Sections 6.3(a) and (b) of the Merger Agreement state:

> Subject to Section 6.4, until the earlier of the Closing or the date, if any, on which this Agreement is terminated pursuant to Section 7.1, Aegerion shall not, and

Aegerion shall cause the Aegerion Subsidiaries and each of its and their respective Representatives not to, directly or indirectly through any other Person:

(i) initiate, solicit, facilitate or knowingly encourage (including by way of furnishing or affording access to information), or take any other action that intentionally promotes, directly or indirectly, or may reasonably cause, any inquiries or the making of any proposal or offer with respect to an Aegerion Acquisition Proposal or potential Aegerion Acquisition Proposal;

(ii) participate or engage in any discussions or negotiations regarding, or otherwise cooperate in any way with, or assist or participate in, knowingly encourage or otherwise facilitate, any effort or attempt by any other Person (other than QLT and its Affiliates) to make or complete an Aegerion Acquisition Proposal;

(iii) effect any Aegerion Change of Recommendation (other than in accordance with Section 6.4); or

(iv) accept or enter into, or publicly propose to accept or enter into, any letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement, transaction agreement, implementation agreement, option agreement, joint venture agreement, alliance agreement, partnership agreement or other agreement, arrangement or undertaking constituting or related to, or that would reasonably be expected to lead to, any Aegerion Acquisition Proposal (an " Aegerion Acquisition Agreement ").

(b) Aegerion shall, and shall cause its Subsidiaries and each of its and their respective Representatives to, immediately upon execution of this Agreement cease and cause to be terminated any solicitation, encouragement, discussion or negotiation with or involving any Person (other than QLT and its Affiliates) conducted heretofore by Aegerion or the Aegerion Subsidiaries, or any of its or their respective Representatives, with respect to any Aegerion Acquisition Proposal or which could reasonably be expected to lead to an Aegerion Acquisition Proposal and, in connection therewith, Aegerion will immediately discontinue access by any Person (other than Aegerion and its Affiliates) to any data room (virtual or otherwise) established by Aegerion or its Representatives for such purpose.  Aegerion agrees not to release any third party (other than QLT and its Affiliates) from any "standstill" agreement to which it is a party (it being acknowledged and agreed that (A) the automatic termination of any "standstill" or similar provisions of any agreement as the result of the entering into and announcement of this Agreement pursuant to the express terms of any such agreement shall not itself be a violation of this Section 6.3(b); and (B) the foregoing shall not prevent the Aegerion Board of Directors from considering an Aegerion Acquisition Proposal and accepting an Aegerion Superior Proposal that might be made by any such Person if the remaining provisions of this Section 6.3 have been complied with).  Immediately following the execution of this

Agreement, Aegerion will terminate all access by third parties (other than Aegerion's Representatives) to the Aegerion Data Room and within two (2) Business Days from the date hereof, Aegerion shall request the return or destruction of all confidential non-public information provided to any third parties who have entered into a confidentiality agreement with Aegerion since October 1, 2015 relating to any potential Aegerion Acquisition Proposal and shall use commercially reasonable efforts to ensure that such requests are honored in accordance with the terms of such confidentiality agreements.

74.     Further, the Company must promptly advise QLT of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal.  Section 6.3(d) of the Merger Agreement states:

(d) Aegerion shall promptly (and in any event within 24 hours of receipt) notify QLT, at first orally and then in writing, of any proposal, inquiry, offer or request relating to or constituting an Aegerion Acquisition Proposal, or which could reasonably be expected to lead to an Aegerion Acquisition Proposal, in each case, received on or after the date hereof, of which Aegerion, any of its Subsidiaries or any of their respective Representatives is or becomes aware, or any request received by Aegerion or any of its Subsidiaries or any of their respective Representatives for non-public information relating to Aegerion or any of its Subsidiaries in connection with a potential or actual Aegerion Acquisition Proposal or for access to the properties, books and records or a list of securityholders of Aegerion or any of its Subsidiaries in connection with a potential or actual Aegerion Acquisition Proposal.  Such notice shall include the identity of the Person making such Aegerion Acquisition Proposal or proposal, inquiry, offer or request and a description of the material terms and conditions of such Aegerion Acquisition Proposal or proposal, inquiry, offer or request, including a copy of any written material submitted to Aegerion, any Aegerion Subsidiary or their Representatives.  Aegerion will keep Aegerion promptly and fully informed of the status, including any change to the material terms and conditions, of any such Aegerion Acquisition Proposal, proposal, inquiry, offer or request.

75.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants QLT a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 6.4(a) of the Merger Agreement provides:

(a) Notwithstanding Section 6.3(a) or any other provision of this Agreement to the contrary, Aegerion may, at any time after the date of this Agreement and prior to the Aegerion Meeting, (x) accept, approve or enter into any agreement, understanding or arrangement in respect of an Aegerion Acquisition Proposal (with the exception of a confidentiality agreement described in Section 6.3(f)(ii)(A), the execution of which shall not be subject to the conditions of this Section 6.4(a) and shall be governed by Section 6.3(f) or (y) effect an Aegerion Change of Recommendation with respect to any Aegerion Acquisition Proposal, if and only if:

(i) such Aegerion Acquisition Proposal did not result from a breach of Section 6.3 and Aegerion has complied with the other terms of this Section 6.4;

(ii) the Aegerion Board of Directors has determined in good faith, after consultation with its outside legal counsel and financial advisors, that such Aegerion Acquisition Proposal constitutes an Aegerion Superior Proposal and, after consultation with its outside legal counsel, that the failure to take the relevant action would be reasonably likely to be inconsistent with its fiduciary duties to the Aegerion Stockholders under applicable Laws;

(iii) Aegerion has (A) delivered an Aegerion Superior Proposal Notice to QLT and (B) provided QLT with a copy of the document(s) containing such Aegerion Acquisition Proposal;

(iv) the Right to Match Period shall have elapsed from the later of the date on which QLT received the Aegerion Superior Proposal Notice and the date on which QLT received a copy of the documents referred to in clause (B) of Section 6.4(a)(iii), it being understood that the Right to Match Period shall expire at 5:00 p.m. (Vancouver time) at the end of the fifth (5th) full Business Day following such later date; provided, that the Right to Match Period shall be subject to Section 6.4(e);

(v) if QLT has offered to amend the terms of this Agreement and the Merger during the Right to Match Period pursuant to Section 6.4(b), the Aegerion Board of Directors has determined in good faith, after consultation with its outside legal counsel and financial advisors, that such Aegerion Acquisition Proposal continues to be an Aegerion Superior Proposal when assessed against this Agreement and the Transaction as they are proposed to be amended as at the termination of the Right to Match Period and, after consultation with its outside legal counsel, that the failure to take the relevant action would be reasonably likely to be inconsistent with the fiduciary duties of the Aegerion Board of Directors under applicable Laws; and

(vi) with respect to clause (x) above, Aegerion has previously or concurrently will have terminated this Agreement pursuant to Section 7.1(c)(ii) and paid the Termination Fee pursuant to Section 7.2.

76.     Further locking up control of the Company in favor of QLT, the Merger Agreement contains a provision for a "termination fee" of $5 million, payable by the Company to QLT if the Individual Defendants cause the Company to terminate the Merger Agreement.

77.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

78.     Additionally, certain shareholders of Aegerion holding approximately 23.1% of the outstanding Aegerion common shares have entered into voting agreements with QLT, pursuant to which they will vote their shares in favor of the Proposed Transaction.  Accordingly, such shares are already locked up in favor of the merger.

*Interests of the Company's Officers and Directors*

79.     The Company's officers and directors stand to receive significant benefits as a result of the Proposed Transaction.

80.     For example, Individual Defendant Szela will serve as CEO of the post-transaction company.  In addition, Szela stands to receive $1,172,718 as a result of the Proposed Transaction.

81.     Furthermore, the other members of Aegerion's management team will retain their positions at the post-transaction company.

82.     Additionally, four of Aegerion's directors will serve on the board of directors of the post-merger company.

*The Materially Incomplete and Misleading Registration Statement*

83.     Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction.  As alleged below and elsewhere herein, the Registration Statement omits

material information that must be disclosed to Aegerion's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

84.     The Registration Statement omits material information with respect to the process and events leading up to the Proposed Transaction, as well as the opinions and analyses of Aegerion's financial advisor, J.P. Morgan.   This omitted information, if disclosed, would significantly alter the total mix of information available to Aegerion's stockholders.

85.     For example, the Registration Statement fails to disclose the timing and nature of all communications regarding future employment or directorship of Aegerion's officers and directors, including who participated in all such communications.

86.     In that regard, the Registration Statement fails to disclose the nature of the discussions held on February 6, 2016 regarding the "potential governance arrangements" in connection with a merger with QLT.

87.     The Registration Statement fails to disclose the updates to the draft term sheet provided to Aegerion on March 9, 2016, including whether the updates pertained to the post-transaction employment of Szela and/or other members of Aegerion management.

88.     The Registration Statement fails to disclose the "certain terms under negotiation" as discussed at the March 11, 2016 Transaction Committee meeting, including whether the terms pertained to the post-transaction employment of Szela and/or other members of Aegerion management.

89.     The Registration Statement fails to disclose whether Company A entered into a confidentiality agreement with Aegerion, and if so, the terms of such agreement, including whether it contained standstill and/or "don't ask, don't waive" provisions.

90.     The Registration Statement fails to disclose the terms of Company B's May 23, 2016 proposal.

91.     The Registration Statement fails to disclose the terms of Company D's June 3, 2016 proposal.

92.     The Registration Statement fails to disclose the reasons provided by Company D on June 5, 2016 for not pursuing a transaction with Aegerion, despite expressing its interest the very day before.

93.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis* for Aegerion, the Registration Statement fails to disclose: (i) the net operating losses ("NOLs") that Aegerion is expected to utilize during the 17.5-year period ending on December 31, 2033; (ii) the inputs and assumptions underlying J.P. Morgan's analysis of the weighted average cost of capital ("WACC") of Aegerion; (iii) the present value of expected cash outflows as a result of the ongoing regulatory actions and investigations; and (iv) stock-based compensation.

94.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis* for QLT, the Registration Statement fails to disclose: (i) the NOLs that QLT is expected to utilize during the 24.5-year period ending on December 31, 2040; (ii) the inputs and assumptions underlying J.P. Morgan's analysis of the WACC of QLT; (iii) the estimated value of the "Synergies"; and (iv) the unlevered free cash flows that QLT is expected to generate.

95.     The Registration Statement fails to disclose a summary of J.P. Morgan's selected companies analysis.

96.     The Registration Statement fails to disclose a summary of J.P. Morgan's selected transactions analysis.

97.     The Registration Statement fails to disclose the amount of compensation J.P. Morgan has received for past services provided to QLT and its affiliates in the last two years.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Aegerion**

98.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

99.     The Individual Defendants disseminated the false and misleading Registration Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Aegerion is liable as the issuer of these statements.

100.    The Registration Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.   By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

101.    The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

102.    The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to stockholders.

103.    The Registration Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

104.    By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

105.    Because of the false and misleading statements in the Registration Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and QLT

106.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

107.    The Individual Defendants and QLT acted as controlling persons of Aegerion within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Aegerion and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

108.    Each of the Individual Defendants and QLT was provided with or had unlimited access to copies of the Registration Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

109.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Registration Statement contains the unanimous

recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Registration Statement.

110.  QLT also had direct supervisory control over the composition of the Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement.

111.  By virtue of the foregoing, the Individual Defendants and QLT violated Section 20(a) of the 1934 Act.

112.  As set forth above, the Individual Defendants and QLT had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.  Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.  In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.  Directing the Individual Defendants to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.  Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as

well as Rule 14a-9 promulgated thereunder;

     E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

     F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: August 16, 2016                     **MATORIN LAW OFFICE, LLC**

                                     By:    */s/ Mitchell J. Matorin*
                                           Mitchell J. Matorin (BBO# 649304)
                                           18 Grove Street, Suite 5
                                           Wellesley, MA 02482
                                           (781) 453-0100

                                           *Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Gina M. Serra
Jeremy J. Riley
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310